Estate of Minnie Miller, deceased, Morris Miller, executor v. Commissioner.
Estate of Miller v. Commissioner
Docket No. 7025-65,
United States Tax Court
T.C. Memo 1968-230; 1968 Tax Ct. Memo LEXIS 68; 27 T.C.M. (CCH) 1140; T.C.M. (RIA) 68230; October 7, 1968. Filed Milton I. Baldinger and Arthur P. Scibelli, First Federal Savings Bldg., 608 13th St., N.W., Washington, D.C., for the petitioner. Francis J. Cantrel, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent found an overassessment in the income tax liability of petitioner for the year ended March 31, 1963, in the amount of $2,136.27 and determined a deficiency in income tax for the year ended March 31, 1964, in the amount of $24,218.07. A small part of the deficiency thus determined results from the disallowance of certain amounts deducted on account of depreciation. *71 Respondent has conceded error in connection with his disallowance of such depreciation deductions. The overassessment and that part of the deficiency which is now at issue arise by reason of the following circumstances and adjustments: In January, 1963, Morris Miller, as executor and trustee, sold and conveyed a certain partnership interest in real estate belonging to decedent Minnie Miller, the wife of Morris, to a son of Minnie and Morris for a price approximately $1,000 in excess of the amount at which the interest sold was valued for estate tax purposes. Subsequent to such sale respondent's agents concluded and petitioner agreed that the valuation of this property should be increased for estate tax purposes to a figure greatly in excess of the price paid by decedent's son, resulting in a substantial capital loss being claimed by petitioner instead of the small capital gain which is originally reported. This adjustment resulted in respondent's determination of an overassessment for the fiscal year ended March 31, 1963. In the year ended March 31, 1964, petitioner sold other real estate owned by it for a price considerably in excess of its basis and deducted from the resulting capital *72 gain the capital loss carried over from the sale of the partnership interest in the preceding year. Respondent determined that there was no such deductible loss because of the provisions of section 267(a), Internal Revenue Code of 1954 and in an amended answer filed at the trial herein respondent alleged that no deduction on account of such loss should be allowed because of the provisions of section 165, I.R.C. 1954. In his reply brief respondent has conceded that section 267 of I.R.C. 1954 would not preclude deduction of the claimed loss in issue. Findings of Fact Some of the facts herein were stipulated. We find those facts to be as stipulated and incorporate herein by this reference the stipulation and the exhibits attached thereto. Petitioner is the Estate of Minnie Miller, hereinafter referred to as the decedent, who died testate on April 8, 1961. She was survived by her husband, Morris Miller, by three adult children, Louis Miller, Ida Miller Furr and Gerald J. Miller, and by a number of grandchildren and great grandchildren. Decedent's Last Will and Testament was admitted to probate in the Orphans Court *73 of Montgomery County, Maryland, on June 20, 1961, and on the 1141 same day letters testamentary were granted to decedent's surviving husband, Morris. Morris has been engaged in the real estate business in Montgomery County for approximately 25 years. Decedent's Will, after providing for a bequest to a family foundation and certain specific bequests of no moment in this case, provided for the balance of the residue to be divided by the executor or executors into three equal shares. One of these equal shares was bequeathed and devised in Paragraph IX of the Will as follows: I give, devise and bequeath one (1) equal share, as determined by my executors under Paragraph VI to my husband Morris Miller, if he is alive, as sole trustee, and if he is not alive or does not care to act or does not appoint five (5) successor trustees upon his death, to Louis Miller, Gerald Miller, Ida Furr, Max Holtzman and Louis C. Grossberg, IN TRUST NEVERTHELESS, the following purposes: (a) To distribute the income among my son Gerald Miller and the guardian of his children if any are not of legal majority. in such installments as shall be convenient for all parties concerned, but in any event at *74 least semi-annually, in such amounts and proportions as the trustees, other than my son Gerald Miller, shall determine in their sole and complete discretion, until the death of my son Gerald Miller. (b) After the death of my son Gerald Miller, the trustees shall pay or turn over the trust estate to the spouse and blood or adopted children or grandchildren of any degree of my son Gerald Miller, and to any institutions organized exclusively for religious, charitable, educational or scientific purposes, in such amounts, estates or proportions, and in such manner, whether in trust or otherwise (except that he shall not create or grant another power of appointment) as my son Gerald Miller shall appoint in his last will and testament. (c) If my son Gerald Miller fails by his last will and testament to exercise effectively the special power of appointment conferred in (b) immediately preceding, then the trustees are to pay the net income arising from such trust estate in equal shares to the guardian or guardians of the children born to or adopted by my son Gerald Miller as may survive my son Gerald Miller, if such child or children are under the age of twenty-one (21) years, to be used *75 for the benefit of such children of my son Gerald Miller, in such installments as shall be convenient for all parties concerned, but in any event at least once each year. When each child of my son Gerald Miller shall attain the age of twenty-one (21) years, his or her share of income shall be paid to him or her in such installments as shall be convenient for all parties concerned, but in any event at least once each year. And, twenty (20) years after the date of the death of my son Gerald Miller, such trust estate shall be divided equally among the living blood or adopted children and living blood or adopted grandchildren of any degree of my son Gerald Miller, per capita. If any of such grandchildren of any degree of my son Gerald Miller shall not have attained the age of twenty-one (21) years, then, and in such event, I give and grant to the trustees the power in trust, in each such case, to take possession, hold, administer, invest and re-invest such part of the trust estate for such infant's benefit during his or her minority, and to collect the income therefrom, and, after paying all lawful expenses incident to the execution thereof, to pay the net income thereof, if the trustees *76 shall so elect, to the legally appointed guardian of the property of the infant entitled to receive the same; or the trustees may, at their election, apply so much of the net income as they shall deem necessary for the education, maintenance and support of such infant, and accumulate any unexpended balance of such net income during the minority of such infant; and to pay or turn over all of the net income so accumulated and the trust estate to such infant if and when he or she shall attain the age of twenty-one (21) years; but if such infant shall die before reaching the age of twenty-one (21) years, the net income so accumulated and the trust estate shall be paid to the persons entitled to take as heirs at law of the infant so dying. If no blood or adopted children or grandchildren of any degree of my son Gerald Miller shall be alive twenty (20) years after his death, then the trust estate shall be paid or turned over to the blood or adopted nieces, nephews, grandnieces or grandnephews of any degree of my son Gerald Miller, then alive, per capita, and if there are none, then to his heirs at law. (d) The trustee or trustees shall have all of the powers which are conferred in Paragraph *77 XI. If my husband or any of the five (5) named trustees do not survive me or do not care to qualify as trustee, then I nominate Samuel Block as first alternate, and Milton I. Baldinger as second alternate, and the trustees who shall first qualify are hereby authorized and empowered to fill any other vacancy or vacancies so that there shall be five (5) qualifying trustees. The five (5) trustees who shall first qualify are hereby authorized and empowered to each appoint his or her successor in trust. It is my wish 1142 that the appointment of a successor by each trustee may be made by will or by a sealed instrument pursuant to the procedure spelled out in Paragraph X. Any person so nominated or appointed as a successor trustee shall have, and may exercise, the same rights, powers, authorities and discretions, and shall be charged with the same duties, as if he or she were named as an original trustee. (e) In case of disagreement among the trustees, a majority vote shall govern, and if there is no majority the matter shall be submitted to arbitration in accordance with the rules of the American Arbitration Association. (f) If my son Gerald Miller does not survive me or shall die *78 childless, and he shall not exercise the special power of appointment conferred in (b) above, then the balance remaining in the trust estate shall be covered in equal shares into the trust estates created for the benefit of my son Louis Miller in Paragraph VII, and my daughter Ida Furr in Paragraph VIII. (g) A majority of the trustees are hereby authorized and empowered to use any or all of the trust estate, at any time, in their sole and complete discretion, for the benefit of any beneficiary under this Paragraph IX, despite any other provision of this will, provided, that if such beneficiary is also a trustee, he or she shall not vote on the matter. Similar provisions in Paragraphs VII and VIII of decedent's Will related to testamentary trusts for Louis Miller and his family and for Ida Miller Furr and her family. On July 16, 1962, a True and Perfect Inventory of all the Goods, Chattels and Personal Estate of decedent was filed in the Orphans Court by two legally authorized appraisers. Included in the inventory was a partnership interest owned by the decedent at the time of her death in Spring Gardens Associates which was appraised at $100,000. On October 15, 1963, the First *79 Account of Morris Miller, Executor of the Estate of Minnie Miller, Deceased, was filed in the Orphans Court, was "examined and approved by the Court" and was "admitted to record." On April 6, 1965, the executor's Second and Final Account was filed with the Court and was "examined," "approved" and "admitted to record." The First Account lists as an asset "Spring Gardens Associates Partnership interest" which is valued at $100,000. The Second and Final Account lists as an item of income the following: *10 Gain on Sale of Spring Gardens Associates (Partnership interest)
Sales Price
$101,986.73
Appraised Value 100,000.00
$1,986.73
Spring Gardens Associates is a partnership which was organized October 1, 1941. At all times relevant to this proceeding it owned an apartment house project known as Spring Gardens Apartments, including adjoining buildings known as Blair Mill, located in Silver Spring, Montgomery County, Maryland. It also owned a parking lot at the Oxon Run Hills Shopping Center, Prince George's County, Maryland, and other assets. On April 8, 1961, its partners, each owning a one-fourth undivided interest in and to said partnership *80 were: (a) decedent, (b) Morris Miller, husband of decedent, (c) Louis Miller, son of decedent, and (d) Ida Miller Furr, daughter of decedent. The partnership agreement is not contained by the record herein. Morris Miller had a controlling voice in the operation of the affairs of the partnership not only because of his relationship to the other partners as husband and father but also because of his expert knowledge of real estate. Gerald is and has been for a number of years a member of the bar of the District of Columbia and of Maryland. He has had considerable experience in real estate transactions in the Washington Metropolitan Area. He is an attorney of record in the State of Maryland in connection with the settlement of his mother's estate. Decedent's one-fourth undivided interest in and to the partnership known as Spring Gardens Associates was not at any time subsequent to decedent's death up to and including the date of the sale thereof to Gerald J. Miller offered for sale, publicly or privately, to anyone other than Gerald J. Miller. Morris Miller, the executory and testamentary trustee, was of the opinion that a sale to an outsider of an interest in a family partnership *81 would have been unwise from the standpoint of both the partnership and the outsider contemplating the purchase. He told Gerald that he thought it would be best for everybody if Gerald owned the fourth part formerly owned by decedent. It is stipulated that on June 15, 1956, decedent gave to Gerald J. Miller, a "25% interest in commercial lot, 11,509 sq. ft., Oxon Run Hills, Prince George's Co., Md.," valued at $3,164.98. On the same date 1143 Ida Miller Furr and Louis Miller each gave to Gerald J. Miller "a one-fourth undivided interest in and to a commercial lot located at Oxon Run Hills, Prince George's County, Maryland," each of which was valued at $3,164.98. It is also stipulated that "on June 15, 1965 [sic]," Morris Miller "made a gift of his 25% interest in a commercial lot, 11,509 square feet, Oxon Run Hills, Prince George's County, Maryland, to Gerald J. Miller." It is stipulated that during her lifetime decedent made many gifts to Gerald J. Miller and that "these gifts, the dates on which made and the claimed approximate values of said gifts," in addition to the "25% interest in commercial lot ***, Oxon Run Hills, Prince George's Co., Md.," valued at $3,164.98 "are *82 as follows: " Gifts
Date of Gifts
ApproximateValues Claimed
98 shares of nonvoting common stock of M. Miller, Inc.
5/20/60
$25,449.49
6 shares of nonvoting common stock of Spring Knolls, Inc.
12/27/60
$2,490.78
1/8 undivided interest in 8,000 sq. ft. of land in Parcel F., Oxon Run Hills, Prince George's Co., Maryland
9/27/60
$ 1,000.00
221 shares (25 voting, 196 non-voting) of Spring Knolls, Inc.
1/21/61
$91,743.73
Decedent wrote a letter to Gerald J. Miller, which was dated December 30, 1960, and which read as follows: Dear Son Gerry: I have been advised by Milton I. Baldinger of your financial standing as contrasted with the financial standing of Ida and Lou. Honestly, I did not know of the gap and thus during the year I made some gifts to you. I want you to know that I am making some additional gifts to you today and intend to make further gifts to you during the coming year. I sincerely look forward to the day when, as a result of the various gifts I contemplate making to you over the next several years, that the difference financially among my three children will be narrowed considerably. I know how hard you are working *83 as a lawyer and we are all proud of you. Also, I know the high cost of living and of rearing and educating children. I hope that in the long run the gifts I have made and the gifts that I intend to make to you will ease the financial path for you and your family. I love you very much, my son. Your Mother, Minnie Miller On January 2, 1963, Gerald J. Miller purchased the one-fourth undivided interest in and to the partnership known as Spring Gardens Associates which was owned by decedent on the date of her death for $101,986.73. This was the amount of decedent's capital account in the partnership as of December 31, 1961 and December 31, 1962, as shown in the income tax returns of the partnership. The AGREEMENT AND CONVEYANCE evidencing this sale, was duly executed by the parties involved and reads in pertinent part as follows: AGREEMENT AND CONVEYANCE This AGREEMENT AND CONVEYANCE made as of this 2nd day of January, 1963, by and between MORRIS MILLER of Takoma Park, Maryland, acting in his capacity as Executor and Trustee under the Last Will and Testament of Minnie Miller, deceased (hereinafter for convenience referred to as "vendor"), party of the first part, and GERALD *84 J. MILLER of Chevy Chase, Maryland (hereinafter for convenience referred to as "vendee"), party of the second part. WITNESSETH: WHEREAS, vendor is the owner of the one-fourth (1/4) undivided interest in and to the partnership known as "Spring Gardens Associates" (hereinafter for convenience referred to as "the partnership"), formerly owned by the late Minnie Miller; and WHEREAS, vendor has agreed to sell and vendee has agreed to buy, all of the right, title and interest of the late Minnie Miller in and to the partnership and its property and assets in accordance with terms and conditions more fully hereinafter set forth, NOW, THEREFORE, in consideration of the premises and of the promise of the vendee to pay the purchase price as hereinafter set forth, the parties hereto hereby agree as follows: 1. Vendor represents that the partnership is the owner of certain real property described as follows: * * * Vendor further represents that the partnership is the owner of certain other assets and is the obligated party with respect to certain liabilities, all of which are 1144 more fully set out in a balance sheet of the partnership as of December 31, 1962, prepared by Louis *85 C. Grossberg, Certified Public Accountant, a copy of which balance sheet is attached hereto and marked "Exhibit A." 2. The interest of the late Minnie Miller in and to the partnership being sold by the vendor to the vendee in accordance with the terms and conditions hereof does not include a certain obligation in the amount of $51,424.96 owed by the partnership to the Estate of Minnie Miller by reason of an entry made upon the books and records of the partnership as of the date of these presents converting a portion of the former capital interest of the late Minnie Miller to a debt obligation. 3. Vendor agrees to sell, and vendee agrees to buy, all of the right, title and interest of the late Minnie Miller, in and to the partnership and the property and assets of the partnership, excepting that portion thereof specifically excluded in paragraph 2 hereinabove and, subject, however, to all debts and obligations of the partnership. Vendor hereby assigns, transfers, sets over and conveys to the vendee, his heirs, executors, administrators, successors and assigns, all of the property being sold as aforesaid. Vendor agrees to execute, acknowledge and deliver to vendee promptly after *86 execution of these presents and from time to time thereafter, such deeds and other instruments of conveyance as may be required to transfer good title to all of the property being sold to vendee. 4. The purchase price payable by vendee to vendor in consideration of the sale provided for herein shall be the sum of One Hundred One Thousand Nine Hundred Eighty-Six Dollars and Seventy-Three Cents ($101,986.73). The entire purchase price shall be evidenced by a negotiable promissory note of the vendee, endorsed by Judith Miller, wife of the vendee which promissory note shall be payable as follows: (a) Interest for the first year of the note, at the rate of five percent (5%) per annum, shall be due and payable on January 2, 1964. (b) The sum of Twenty-One Thousand Nine Hundred Eighty-Six Dollars and Seventy-Three Cents ($21,986.73) shall be payable on or before November 15, 1963, in curtailment of the principal obligation of the promissory note. (c) The sum of Ten Thousand Dollars ($10,000.00) shall be due and payable on the promissory note on January 2, 1965 and annually thereafter, up to and including January 2, 1973. The said sums shall be applied first to the payment of interest *87 computed at the rate of 5% per annum on the unpaid principal balance of the note and the balance of such payment shall be applied to the reduction of the principal of the note. (d) The balance, if any, of the principal obligation, together with any interest accrued thereon at the rate of 5% per annum, shall be due and payable on or before January 2, 1974. (e) The vendee shall have the privilege of making additional payments of principal in any amount at any time. 5. The parties anticipate that a new partnership agreement for the partnership will be executed promptly after the consummation of this Agreement and Conveyance between the surviving partners of the partnership and the vendee. * * * IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals on the day and year first hereinafter written. On January 2, 1963, a new partnership was formed for Spring Gardens Associates made up of (a) Morris Miller, (b) Louis Miller, (c) Ida Miller Furr, and (d) Gerald J. Miller, with each owning an undivided one-fourth interest in said partnership. Paragraph 11 of the new partnership agreement reads as follows: Death. Upon the death of any partner, his estate, or *88 any person to whom he has bequeathed his partnership interest, shall have the right to elect either to join in the formation of a new partnership with the surviving partners upon terms and conditions essentially identical to those contained herein or to sell the decedent's interest in the partnership to the surviving partners. The election to continue as a member of the partnership shall be exercised by the service of notice in writing upon the surviving partners within nine (9) months after the death of the decedent. (a) If the personal representative or legatee elects to continue in the partnership, he shall succeed to all the rights and be subject to all of the obligations of the deceased partner under this agreement, except that in the case of a personal representative, he shall not be liable for partnership debts in excess of his interest in the partnership assets. (b) If the personal representative or legatee shall not elect to join in the formation of a new partnership upon terms and conditions essentially identical to those contained herein, he shall be deemed to have elected to sell the interest 1145 of the decedent in the partnership. The selling price shall be equal *89 to the capital account of the decedent as at the date of his death, and shall be paid by the surviving partners within twenty-four (24) months after the decedent's death. On July 16, 1962, a True and Perfect Inventory of all of the real estate of decedent was filed in the Orphans Court by two authorized appraisers and included their appraisal of the Blair Park Apartments, 7719-21-23 Eastern Avenue, Takoma Park, Maryland, which was appraised as follows: Land
$ 45,532.00
Buildings (53 Units) 142,808.00
Total Land and Buildings $188,340.00 Decedent was the sole owner of the Blair Park Apartments at the time of her death. This property at that time was not encumbered by any mortgage. On July 6, 1962 petitioner filed a United States Estate Tax Return (Form 706) for the decedent's estate with the district director, Internal Revenue Service, Baltimore, Maryland. In schedule A attached thereto the Blair Park Apartments were valued at date of decedent's death at $188,340. In schedule F attached thereto, decedent's onefourth undivided partnership interest in Spring Gardens Associates was valued at $100,000 as of the date of her demise. By contract duly executed *90 and dated February 20, 1963, petitioner agreed to sell the Blair Park Apartments to Cy Freedman for $300,000. Thereafter, on May 31, 1963, the apartments were conveyed to Cy and Selma Freedman, unrelated third parties. The deed recited that the grantor was Morris Miller, Trustee under the Last Will and Testament of Minnie Miller, Deceased. Subsequent to the filing of the Estate Tax Return on July 6, 1962, it was examined by a representative of the district director's office at Baltimore. As a result of this examination petitioner agreed on October 12, 1964, and now stipulates that the value of decedent's undivided one-fourth interest in and to the partnership known as Spring Gardens Associates on the date of decedent's death was $264,097. It was further agreed by petitioner, also as a result of this examination, and petitioner now stipulates that the value of the Blair Park Apartments which were solely owned by decedent, as of the date of her demise, was $250,000. An increased estate tax deficiency of $75,012.72, predicated upon the agreement, was paid by petitioner. On July 15, 1963, Morris Miller, as executor, filed a U.S. Fiduciary Income Tax Return (Form 1041), for the estate *91 of decedent for the taxable year ended March 31, 1963. In that return a long term capital gain of $1,986.73 was reported on the sale of decedent's one-fourth undivided partnership interest in Spring Gardens Associates to Gerald J. Miller. On November 16, 1964, Morris Miller, as executor, filed a claim for refund (Form 843) for the taxable year ended March 31, 1963. This claim was based in part on a loss determined on the sale of the partnership interest of decedent in Spring Gardens Associates to Gerald J. Miller as follows: Acquired 4-9-61 (basis per audited Form 706)
$264,097.00
Sold 1-2-63 - Sale Price 101,986.73
Long Term Capital Loss $162,110.27 On November 16, 1964, Morris Miller, as executor, filed a U.S. Fiduciary Income Tax Return (Form 1041) for the estate of decedent for the taxable year ended March 31, 1964, in which an unused capital loss carryover from the taxable year ended March 31, 1963 was claimed in the amount of $161,110.27. This carry-over was determined by offsetting $1,000 of the claimed loss on the sale of decedent's partnership interest for the taxable year ended March 31, 1963 and carrying the balance over to the taxable *92 year ended March 31, 1964. The claimed capital loss carry-over of $161,110.27 was offset against a long term capital gain of $93,015.91, resulting in a claimed net capital loss of $68,094.36 for the taxable year ended March 31, 1964. This $93,015.91 gain resulted from the sale of the Blair Park A partments and was determined as follows: Selling Price 5-31-63
$300,000.00
Less: Basis 4-9-61
$250,360.09
Less: Depreciation 43,376.00
206,984.09
Gain $ 93,015.91 Respondent in his statutory notice of deficiency mailed to Estate of Minnie Miller, Mr. Morris Miller, Executor, on September 27, 1965, involving the fiscal year ending March 31, 1963, determined that a loss was sustained on the sale of decedent's partnership interest in Spring Gardens Associates in the amount of $162,110.27 instead of a gain of $1,986.73 as reported in Schedule D of the U.S. Fiduciary Income Tax Return (Form 1041) and further 1146 determined that the loss was not allowable in accordance with the provisions of section 267(a) of the Internal Revenue Code. This resulted in an overassessment for the fiscal year ending March 31, 1963. In that *93 part of the same statutory notice of deficiency which related to the taxable year ending March 31, 1964, respondent determined that the capital loss carry-over of $161,110.27 was being disallowed under the adjustment made for the fiscal year ending March 31, 1963. This resulted in a deficiency for that fiscal year in the sum of $24,218.07. In his Amended Answer, respondent alleged that the loss resulting from the sale of decedent's undivided one-fourth partnership interest is not allowable as a deduction within the purview of section 165 of the Internal Revenue Code of 1954 "in that they were incurred in a family transaction and did not result from a bona fide arms'length transaction entered into for profit." Opinion KERN, Judge: The sole issue for our determination is whether the sale of the decedent's partnership interest to her son Gerald was a "transaction entered into for profit" within the meaning of section 165(c) (2), I.R.C. 1954. This entire section is quoted by us in the margin hereof. [1] Unless we are able to conclude that the sale was a "transaction entered into for profit," any loss resulting therefrom is not deductible *94 in the fiduciary income tax returns of decedent's estate and consequently is not available for use as an unused capital loss carryover in a succeeding year. *95 In our opinion this sale was not a "transaction entered into for profit." The selection of the purchaser by the vendor was obviously not motivated by any consideration of profit and the price was fixed by no bargaining which reflected an interest on the part of the vendor in realizing any profit from the transaction. Morris and Gerald, both of whom were experienced in the real estate field, arranged for the acquisition by Gerald of a partnership interest held by the estate of Gerald's deceased mother at a price which was equivalent to the penny to the amount of the deceased's capital account in the partnership as of the time of the "sale" ($101,986.73) even though it is now stipulated that the fair market value of decedent's partnership interest was $264,097. It is our conclusion that this transaction though cast in the form of a "sale" was in reality a family arrangement suggested by Morris and acquiesced in by decedent's surviving children for a transfer of decedent's partnership interest to Gerald in a manner which would not be inequitable to the other children, rather than a "transaction entered into for profit." We impute no fraud to the parties connected with the transaction *96 here involved. It accomplished what they intended, i.e., a property arrangement within the Miller family which tended to equalize the holdings of Gerald vis-a-vis his brother and sister. In that the transaction involved the transfer of property for a consideration it may be called a sale. However, when, as in this case, there is no effort on the part of the "vendor" to obtain the best price 1147 possible and the record clearly indicates that the "vendee" was chosen without regard to the price offered but on account of his relationship to the "vendor" and other interested parties and the price named was less than one-half the fair market value of the property as stipulated by the parties, it is impossible for us to consider the transfer as 1148 an arms'-length transaction or as a transaction entered into for profit. See Evans v. Rothensies, 114 F. 2d, 958. This combination of facts distinguishes this case from those cited by petitioner, e.g., compare Estelle G. Marx, 5 T.C. 173; N. Stuart Campbell, 5 T.C. 272. We note that neither party has made any argument predicated on any provision of the partnership agreement giving rise to the partnership *97 interest of decedent which is here considered [2] or on any provision of the Maryland Code relating to partnerships. Because of minor concessions made by respondent, Decision will be entered under Rule 50. Footnotes
1. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred by a trade or business: (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss of such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return. (d) Wagering Losses. - Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions. (e) Theft Losses. - For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. (f) Capital Losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. (g) Worthless Securities. - (1) General Rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle. be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security Defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; (B) a right to subscribe for, or to receive, a share of stock in a corporation; or (C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form. (3) Securities in Affiliated Corporation. - For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. For purposes of the preceding sentence, a corporation shall be treated as affiliated with the taxpayer only if - (A) at least 95 percent of each class of its stock is owned directly by the taxpayer, and (B) more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents, (except rents derived from rental of properties to employees of the corporation in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, and gains from sales or exchanges of stocks and securities. In computing gross receipts for purposes of the preceding sentence, gross receipts from sales or exchanges of stocks and securities shall be taken into account only to the extent of gains therefrom. (h) Disaster Losses. - Notwithstanding the provisions of subsection (a), any loss (1) attributable to a disaster which occurs during the period following the close of the taxable year and on or before the time prescribed by law for filing the income tax return for the taxable year (determined without regard to any extension of time), and (2) occurring in an area subsequently determined by the President of the United States to warrant assistance by the Federal Government under sections 1855-1855g of title 42, at the election of the taxpayer, may be deducted for the taxable year immediately preceding the taxable year in which the disaster occurred. Such deduction shall not be in excess of so much of the loss as would have been deductible in the taxable year in which the casualty occurred. If an election is made under this subsection, the casualty resulting in the loss will be deemed to have occurred in the taxable year for which the deduction is claimed. (i) Certain Property Confiscated by the Government of Cuba. - (1) Treatment as Subsection (c)(3) Loss. - For purposes of this chapter, in the case of an individual who was a citizen of the United States, or a resident alien, on December 31, 1958, any loss of property which - (A) was sustained by reason of the expropriation, intervention, seizure, or similar taking of the property, before January 1, 1964, by the government of Cuba, any political subdivision thereof, or any agency or instrumentality of the foregoing, and (B) was not a loss described in paragraph (1) or (2) of subsection (c), shall be treated as a loss to which paragraph (3) of subsection (c) applies. In the case of tangible property, the preceding sentence shall not apply unless the property was held by the taxpayer, and was located in Cuba, on December 31, 1958. (2) Special Rules. - (A) For purposes of subsection (a), any loss described in paragraph (1) shall be treated as having been sustained on October 14, 1960, unless it is established that the loss was sustained on some other day. (B) For purposes of subsection (a), the fair market value of property held by the taxpayer on December 31, 1958, to which paragraph (1) applies, on the day on which the loss of such property was sustained, shall be its fair market value on December 31, 1958. (C) For purposes of section 172, a loss described in paragraph (1) shall not be treated as an expropriation loss within the meaning of section 172(k). (D) For purposes of section 6601, the amount of any tax imposed by this title shall not be reduced by virtue of this subsection for any period prior to February 26, 1964. (3) Refunds or Credits. - Notwithstanding any law or rule of law, refund or credit of any overpayment attributable to the application of paragraph (1) may be made or allowed if claim therefor is filed before January 1, 1965. No interest shall be allowed with respect to any such refund or credit for any period prior to February 26, 1964. (j) Cross References. - (1) For special rule for banks with respect to worthless securities, see section 582. (2) For disallowance of deduction for worthlessness of securities to which subsection (g)(2)(C) applies, if issued by a political party or similar organization, see section 271. (3) For special rule for losses on stock in a small business investment company, see section 1242. (4) For special rule for losses of a small business investment company, see section 1243. (5) For special rule for losses on small business stock, see section 1244↩.
2. This agreement is not contained in the record before us.↩